1

2

3

**GREBEN & ASSOCIATES**

1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CA 93101
TELEPHONE: (805) 963-9090
FACSIMILE: (805) 963-9098

4

Jan A. Greben, SBN 103464
jan@grebenlaw.com

5

Jeff Coyner, SBN 233499
jeff@grebenlaw.com

6

Daniele De Smeth, SBN 263309
danielle@grebenlaw.com

7

8

Attorneys for Plaintiff and Cross-Defendant KFD Enterprises, Inc., a California corporation dba Norman's Dry Cleaner, and Third-Party Defendant Kenneth Daer

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

12

13

KFD ENTERPRISES, INC., a California
Corporation dba Norman's Dry Cleaner,

Plaintiff,

14

vs.

15

16

17

18

19

20

21

22

23

24

25

CITY OF EUREKA; UNION OIL
COMPANY OF CALIFORNIA, a California
corporation; UNOCAL CORPORATION, a
Delaware corporation; CHEVRON
CORPORATION, a Delaware Corporation;
ENVIRONMENTAL RESOLUTIONS, INC.,
a California corporation; MULTIMATIC
DRY CLEANING MACHINE
CORPORATION, a New Jersey corporation;
MULTIMATIC LLC, a New Jersey limited
liability company, as successor in interest to
Multimatic Corporation and Multimatic Dry
Cleaning Corporation; THE KIRRBERG
CORPORATION, a New Jersey corporation,
formerly known as Multimatic Corporation;
MULTIMATIC CORPORATION, now
known as Kirrberg Corporation; RR STREET
& CO., INC., a Delaware corporation.; and
FIRBIMATIC SPA, an Italian corporation.

Defendants.

26

27

28

And Related Counter-Claims and Third-Party
Claims.

Case No. C 08-04571 MMC

**FOURTH AMENDED COMPLAINT;
DEMAND FOR JURY TRIAL**

1

1   KFD Enterprises, Inc., a California corporation, dba Norman's Dry Cleaner ( "Plaintiff")

2   hereby alleges as follows:

3   **JURISDICTION AND VENUE**

4   1.   Plaintiff's claims against defendants City of Eureka, Union Oil Company of

5   California, Unocal Corporation, Chevron Corporation, Environmental Resolutions, Inc.,

6   Multimatic Dry Cleaning Machine Corporation, Multimatic LLC, The Kirrberg Corporation,

7   Multimatic Corporation, R.R. Street & Co., Inc., and Firbimatic SpA (hereinafter collectively

8   referred to as "Defendants") arise out of environmental contamination at and around 2907 E

9   Street, in Eureka, California ("the Property").

10   2.   This action primarily arises under the federal Comprehensive Environmental

11   Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq. and the

12   Federal Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6972(a)(1)(B).  This

13   Court therefore has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§

14   1331, 2201 et seq.,  42 U.S.C. §§ 9607, 9613, 42 U.S.C. 6972(a) and Federal Rules of the Civil

15   Procedure Rule 57.  This Court has supplemental jurisdiction of the state claims asserted in this

16   action pursuant to 28 U.S.C. § 1367.  The federal and state claims alleged herein are based on the

17   same set of operative facts.  Judicial economy, convenience, and fairness to the parties will result

18   if this Court assumes and exercises jurisdiction over the state claims.

19   3. Venue is proper under the provisions of 28 U.S.C. § 1391(b) and 42 U.S.C. §§ 9613,

20   6972(a) because the claims stated herein arose in this district in Humboldt County.

21   **INTRADISTRICT ASSIGNMENT**

22   4. Intradistrict assignment is proper in this Court under the local rules as the property that

23   is the subject matter of this action and a substantial portion of the events or omissions giving rise

24   to these claims occurred in this judicial district in Humboldt County.

25   **THE PARTIES**

26   5.  Plaintiff KFD Enterprises, Inc., dba Norman's Dry Cleaner ("Plaintiff") is a

27   California corporation.

28   6.  Defendant the City of Eureka ("the City") is a public entity in located Humboldt

1   County, California.

2       7.   Defendant Union Oil Company of California ("Union Oil") is a California

3   corporation.

4       8.   Defendant Unocal Corporation ("Unocal") is a Delaware corporation, who at all

5   relevant times was and is doing business in the State of California.

6       9.   Defendant Chevron Corporation ("Chevron") is a Delaware corporation, who at all

7   relevant times was and is doing business in the State of California.

8       10.   Defendant Environmental Resolutions, Inc. ("ERI") is a California corporation, who

9   at all relevant times was and is doing business in the State of California.

10      11.   Defendant Multimatic Dry Cleaning Machine Corporation ("Multimatic") is a New

11  Jersey corporation, who at all relevant times was and is doing business in the State of California.

12      12.   Defendant Multimatic Corporation ("Multimatic Corp.") is a New Jersey

13  corporation, who at all relevant times was and is doing business in the State of California.

14      13.   Defendant Multimatic LLC ("Multimatic LLC") is a New Jersey limited liability

15  company, who at all relevant times was and is doing business in the State of California.

16      14.   Defendant The Kirrberg Corporation ("Kirrberg") is a New Jersey corporation, who

17  at all relevant times was and is doing business in the State of California.

18      15.   Defendant RR Street & Co., Inc. ("Street") is a Delaware corporation, who at all

19  relevant times was and is doing business in the State of California.

20      16.   Defendant Firbimatic SpA ("Firbimatic") is an Italian corporation, who at all

21  relevant times was and is doing business in the State of California.

22

23                            **GENERAL ALLEGATIONS**

24      17.   Plaintiff has owned and operated a dry cleaning business located at 2907 E Street,

25  City of Eureka, Humboldt County, California ("the Property") since on or about 1980.

26      18.   Plaintiff is informed and believes, and thereon alleges, that from on or about 1964

27  to on or about 1979 defendant Union Oil owned the Property and operated a motor fuel and

28  vehicle repair service station at the Property.  Plaintiff is informed and believes and thereon

1   alleges that hazardous substances, including tetrachloroethylene ("PCE") and both petroleum and

2   non-petroleum based contaminants, were used and stored on the Property by Union Oil.  The

3   operation of the service station led to releases of hazardous substances at the Property.  The acts

4   or omissions by Union Oil resulted in contamination in, at, or around the soil and groundwater

5   underlying the Property and the surrounding soils and groundwater.

6       19.   Plaintiff is informed and believes, and thereon alleges, that on or about 1983, Union

7   Oil was reorganized and continued to operate as Unocal.

8       20.   Plaintiff is informed and believes, and thereon alleges, that on or about 2005, Unocal

9   merged with Chevron.

10      21.   Plaintiff  is informed and believes, and thereon alleges, that defendants Union Oil,

11  Unocal, and Chevron (collectively "Union Oil Defendants"), are liable individually and as the

12  parent corporations, purchasing corporations, alter egos, agents, assignees, surviving entities

13  and/or successor-in-interest of each other.

14      22.    Plaintiff is informed and believes, and thereon alleges, that Multimatic, Multimatic

15  LLC, Kirrberg, Street, and Firbimatic (collectively "Manufacturer Defendants") took affirmative

16  steps to dispose of PCE through their design, manufacture, formulation, packaging, distribution,

17  sale and/or installation of dry cleaning equipment used by Plaintiff on the Property.

18  Manufacturer Defendants specifically designed dry cleaning equipment to store, use, process, and

19  dispose of PCE.  The method of disposal mandated by Manufacturer Defendants' design and

20  instruction resulted in environmental contamination at and near the Property.  Said Manufacturer

21  Defendants represented, asserted, claimed and warranted to Plaintiff that their products were safe

22  and could be operated without causing injury or damage.  Manufacturer Defendants planned for

23  their products, when operated as intended, to cause contamination of the environment.

24      With respect to each, Plaintiff's allegations include, but are not limited to, the following:

25  (a)   Street.  Norman's used a Puritan Still 2000 ("Still") from approximately 1980 to

26      1984 at the Property.  Street has owned the Puritan equipment company since

27      1973.  After acquiring Puritan, Street continued distributing Puritan Stills, as

28      evidenced by the owner's manual for the equipment used at Norman's, Bulletin

1269 (Attached hereto as Exhibit E), which displays Street's brand name logo on the back.

The Puritan Still was created to reclaim PCE through distillation and condensation. The Still connected to the Multimatic dry cleaning machine via a solvent line. The Multimatic fed solvent (PCE) dirtied in the dry cleaning process to the Puritan Still. The Still applied heat to separate dirty PCE waste water at a stage during distillation. Street directed the dry cleaner to introduce "live steam" or heated water vapors to aid in the distillation process. The Still piped the cleaned PCE back to the dry cleaning machine. The creation and disposal of wastewater was a necessary and inherent step in the function of the Puritan Still.

(1)     *Design, Testing, and Manufacture*

Street knew as early as the 1970s that the wastewater produced by its equipment contained PCE, i.e. the Still failed to extract all PCE from the water piped from the Multimatic. Street learned during its testing, design and manufacture process that wastewater would appear clear to the dry cleaner and still contained up to 150,000 micrograms per liter of parts per billion ("ppb") of PCE. The USEPA has set the safe drinking water standard of PCE at 5 ppb. An internal Street memorandum authored by its company scientist, Dr. Manfred Wentz, shared this fact with nearly 10 Street executives in 1991. But Street was aware of the presence of PCE in wastewater (also referred to as separator water) long before 1991. When asked when he first found out that wastewater contained PCE (also called "perc"), Street representative and one-time President, John Stucker, testified under oath:

**A:     Well, again, I knew perc was soluble in water to a small extent. I never really gave much thought to it being in separator water, but I knew it was there if somebody would have specifically asked me.**

**Q:     All right. So in the 1970's you knew there was perc in the separator waste water, but you didn't really pay much attention to it until the**

1    **1990's?**

2    **A:      Correct.  It was not a problem.**

3    Street failed to notify its sales force (the Street employees who interfaced with dry

4    cleaning businesses like Norman's on a routine basis) of this information in the

5    1970s, 1980s and 1990s.  The knowledge possessed by Street's corporate officers

6    and scientists–that the waste water Street instructed dry cleaners to dispose of

7    down the drain contained PCE, even when it appeared clean and clear to the naked

8    eye–remained a corporate secret.

9    (2)      *PCE Contaminated Waste Water Disposal*

10   Despite this knowledge, Street devised a disposal process that discharged this

11   contaminated wastewater into the sewer, where it escaped into the environment.

12   Street did not provide a safe receptacle for contaminated wastewater but instead

13   instructed "waste water from the separator should be caught in a pail or other

14   suitable container rather than being piped to the drain."  (Exhibit E, 4: ¶ G)

15   Street's purpose in directing the wastewater to a pail or other suitable container

16   rather than being piped to a drain was not to avoid disposal down the drain. Street

17   knew when it designed, manufactured and/or distributed the Puritan Still that the

18   only disposal option for the dry cleaner in the early to mid 1980s was to dump the

19   "pail or other suitable container" into the sewer, sink, toilet or other drain at the

20   Property.  Street's Vice President Vincent Romanco admitted this fact under oath.

21   Street intended for dry cleaners to dispose of the wastewater in this manner

22   because even though it knew and believed disposal down the drain to be the

23   common practice, Street never advised against this practice or warned that it could

24   be dangerous to human health or the environment.

25   Street instructed dry cleaners to catch the wastewater in a pail or other suitable

26   container before disposing down the drain so that the dry cleaner could inspect the

27   wastewater emanating from Street's machines for defective performance.  If the

28   wastewater appeared cloudy, it contained more than 150,000 ppb of PCE.  Street

1    advised in its manual that PCE in levels greater than 150,000 ppb (or waste water

2    with a cloudy appearance) could be recaptured from the pail and put back into the

3    dry cleaning machine.  By directing wastewater into a pail, Street intended dry

4    cleaners to pour off the water on top of the pail and maintain the excess PCE that

5    would settle to the bottom of the pail.  Street intended the water that was poured

6    off the top of the pail to go into the sewer, sink, toilet or other drain at the

7    Property.  Street knew there was no other disposal alternative for the dry cleaner

8    during the time it produced and distributed the Puritan Still used at Norman's.

9    Indeed, in its own test labs, Street poured contaminated wastewater down the

10   drain.  The fact that Street chose not to modify this design evidences intent to

11   dispose into the drain, from which PCE escaped into the environment.  Street's

12   instruction to capture wastewater in a pail was driven by economy, not concern for

13   the environment.

14   (3)    *Design and Manufacture Defects Cause PCE Disposal*

15   Given the volatility and toxicity of PCE, the lack of specificity in Street's owner's

16   manual regarding the nature of the receptacle was especially dangerous and

17   evidenced a reckless disregard for potential spills and release of hazardous vapors.

18   The disposal method Street designed and instructed left Norman's with no choice

19   but to dispose of wastewater Street knew to be contaminated down the sewer,

20   sink, toilet or other drain at the Property, where it eventually flowed into the

21   City's sewers and escaped into the environment.   Street did not provide a pail or

22   other suitable container to dry cleaners with its equipment, but expected the dry

23   cleaner to choose a suitable receptacle for the hazardous substance.  Once any

24   excess PCE was retrieved, KFD's only option was to pour the remaining

25   wastewater, which Street knew still contained PCE, down the drain.  Street

26   intended such a disposal because it designed its machine to discharge PCE into

27   the sewers, where it escaped into the environment, evidencing affirmative steps to

28   dispose.

7

Furthermore, Street knew that the Puritan Still design and function resulted in boil-overs, leaks and spills of PCE.  Street admits to these defects in the Still's manual.  (Exhibit E)  During the manufacturing process, Street's testing revealed these and other defects, resulting in releases of PCE.  Despite these known flaws, Street failed to create a safe design for the Puritan Still and failed to adequately warn Plaintiff of its equipment's known defects.

(4)     *Failure to Warn of PCE Hazard and Proper Disposal*

In its manual, Street warns customers with an emboldened "Caution:" when advising customers about the hazards of cleaning the Still with the solution it recommends, Tri Sodium Phosphate ("TSP"):

> **Caution:** Be careful in handling this strong alkali solution [TSP], particularly when it is hot.  You should wear rubber gloves and use eye protection while cleaning the still and be careful not to let the solution splatter on other parts of your body.

By contrast, there is no warning regarding the handling of PCE in Street's manual.  PCE is more toxic and more dangerous to humans and the environment than TSP.  Unlike PCE, TSP is not classified as a hazardous substance under CERCLA or California law.  Considering the Still was designed to treat and process PCE, the absence of warnings with respect to its handling and disposal posed a significant danger to human health and the environment.  Ths absence of warnings regarding PCE is compounded by the presence of warnings about a less-threatening substance like TSP.  The absence of warnings regarding PCE in this context contributed to contamination at and near the Property.

(5)     *Resulting Property Damage*

Street's acts outlined above caused physical injury to both the Property and surrounding properties.  After PCE was deposited down the drain, it flowed into the sewer, where it escaped into soil and groundwater at and surrounding the Property.  As a result, soil at the Property is contaminated and its use is impaired.

1    Digging in it poses a threat to the health of the public, the private owner, and

2    anyone else occupying the Property.  Soil contamination has created toxic soil

3    vapors that pose a danger to public health and can easily escape into the air when

4    soil is moved or displaced.

5    Street's faulty equipment design further caused PCE spills, leaks and boil-overs at

6    Norman's.  During a spill or leak, PCE flowed out of Norman's Dry Cleaner and

7    came into contact with soil on the Property, where it was absorbed and

8    contributed to soil and groundwater contamination at and near the Property.

9    Additionally, the cleanup of these spills and leaks required disposal of PCE down

10   the drain, which proximately caused environmental contamination as described in

11   the preceding paragraph.

12   Wastewater produced by the Still also injured fixtures on the Property by causing

13   corrosion of the plumbing and pipes at and underlying the Property.

14   Street's Puritan Still began to pollute the Property the first time it was operated on

15   or around 1980.  Use of the Still caused boil-overs, leaks and spills resulting in

16   PCE contamination of soil and groundwater via direct contact.  These disposals

17   continued through the last operation of the Still at the Property on or around 1984.

18   Even after the Still was removed from the Property, the contaminated wastewater

19   it produced continued to pollute soil and groundwater at and near the Property due

20   to the slow release of PCE accumulated in the City's sewers.

21   (b)   Multimatic, Multimatic Corp., Multimatic LLC, and Kirrberg (collectively

22   "Multimatic").  KFD's routine use of a Multimatic 25 lb capacity dry cleaning

23   machine from approximately 1980 through approximately 1984 caused

24   contamination at and near the Property.  The Multimatic dry cleaning machine

25   created wastewater containing PCE by its regular use.  Through its design and

26   instruction, Multimatic intended and mandated this wastewater be disposed of

27   down the drain, sink and/or sewer.  The creation and disposal of wastewater was a

28   necessary and inherent step in the function of Multimatic's machine.

(1)     *Design, Testing, and Manufacture*

During the manufacturing process, Multimatic's testing involved running dry cleaning cycles with real clothes to learn how a dry cleaner would operate the Multimatic machine. Multimatic employees used PCE in this process and company representatives, including Ron Velli, were aware that separator water could pose an environmental danger if disposed of down the drain because it contained unsafe levels of PCE. Multimatic knew at least as early as the 1970s that PCE was a hazardous substance.

(2)     *PCE Contaminated Wastewater Disposal*

Instead of warning its customers to take precaution in handling PCE and its disposal, Multimatic instructed dry cleaners to dispose of contaminated wastewater into the sewer, where it was released into the environment:

> **The outflowing waste water from the water separator is contaminated and cannot be used again. Waste water must flow into an open drain.**

(Multimatic Solo Plus Manual, attached hereto as Exhibit F, 5: "WASTE WATER") This directive appears in one of Multimatic's equipment manuals, the Solo Plus 25/35 machine. Due to the passage of time, Norman's does not know the exact model of Multimatic equipment used at the Property. However, Paintiff is informed and believes that instructions for its Multimatic equipment were to dispose of wastewater down the drain. Furthermore, Norman's Multimatic machine was used during the time period Multimatic distributed instructions for the Solo Plus: 1978-1983. Additionally, KFD received instruction to dispose of wastewater from the Multimatic machine down the drain and had no other alternative than to dispose of the contaminated waste water in this manner by virtue of the machine's design. Through Multimatic's design and directive, it took affirmative steps to dispose of PCE.

(3)     *Design and Manufacture Defects Cause PCE Spills*

Multimatic also knew that use of its dry cleaning machines, as designed, resulted

1    in environmental contamination but nevertheless persisted in producing machines

2    of faulty design and poor manufacture quality.  Multimatic employees, executives,

3    and representatives witnessed spills and releases of PCE at Multimatic's plant and

4    testing site in New Jersey.  These incidents were caused by flaws in Multimatic's

5    equipment, including the poor quality of the hoses used to transport PCE and

6    wastewater containing PCE, the quality of the connections on the machinery,

7    including hose connection to the equipment, shrinkage of hoses and leaking

8    gaskets connecting the still to the dry cleaning machine, resulting in the release of

9    PCE and PCE vapors.  In the words of one Multimatic representative about the

10   use of PCE in its machines:

11   In manufacturing, you know, you know how the Fridays and the Mondays work.
     It's not tightened, and the hose pops off, and you get some contamination–not
12   contamination.  You would get a leak, and it would be cleaned up immediately.

13   Several spills occurred at Multimatic's plant during the manufacturing process

14   during the late 1970s and early 1980s.  Despite the known potential for spills and

15   releases of PCE, Multimatic failed to fix the design and manufacturing flaws that

16   caused them.  Multimatic's failure to fix these hazardous-spill causing

17   inadequacies constitutes an affirmation of such disposals, i.e., Multimatic

18   intended PCE disposal to occur and contributed to contamination at the Property,

19   where such spills did occur.

20       (4)    *Failure to Warn of PCE Disposal*

21   Even though it was aware of PCE-spills caused by regular operation of its

22   equipment, Multimatic failed to adequately warn its customers regarding the

23   dangers inherent in operating its machinery and the potential for environmental

24   contamination.  In fact, Multimatic did the opposite and instructed dry cleaners to

25   dispose of wastewater containing PCE down the drain.

26       (5)    *Resulting Property Damage*

27   Multimatic's acts outlined above caused physical injury to both the Property and

28   surrounding properties.  After PCE was deposited down the drain, it flowed into

the sewer, where it escaped into soil and groundwater at and surrounding the Property.  As a result, soil at the Property is contaminated and its use is impaired. Digging in it poses a threat to the health of the public, the private owner, and anyone else occupying the Property.  Soil contamination has created toxic soil vapors that pose a danger to public health and can easily escape into the air when soil is moved or displaced.

Multimatic's faulty equipment design further caused PCE spills and leaks at Norman's.  During a spill or leak, PCE flowed out of Norman's Dry Cleaner and came into contact with soil on the Property, where it was absorbed and contributed to soil and groundwater contamination at and near the Property. Additionally, the cleanup of these spills and leaks required disposal of PCE down the drain, which proximately caused environmental contamination as described in the preceding paragraph.

Wastewater produced by the Multimatic machine also injured fixtures on the Property by causing corrosion of the plumbing and pipes at and underlying the Property.

The Multimatic began to pollute the Property the first time it was operated on or around 1980.  Use of the equipment caused leaks and spills resulting in PCE contamination of soil and groundwater via direct contact.  These disposals continued through the last operation of the Multimatic at the Property on or around 1984.  Even after the machine was removed from the Property, the contaminated wastewater it produced continued to pollute soil and groundwater at and near the Property due to the slow release of PCE accumulated in the City's sewers.

(c)     Firbimatic.  A Firbimatic 132 dry cleaning machine was used at the Property from approximately 1984 through approximately 2002.  The machine generated wastewater containing PCE by its design.  Through its design and instruction, Firbimatic intended and mandated this wastewater flow into the sewer or a small

independent vessel.  (See Operator's Manual, attached hereto as Exhibit G) The

Operator's Manual provides the following rule of installation:

> 8 -    water separator must be connected with the sewer, or in
>
> consideration of the scarce water supply expelled, with a small
>
> independent vessel.

The water separator emitted contaminated wastewater.  Thus, Firbimatic

mandated disposal of waste water to the sewer, from which it escaped into the

environment.  KFD followed this instruction, resulting in contamination at and

near the Property.  Firbimatic provides further instruction regarding connection of

its water separator hose via diagrams in its Operator's Manual.  (Operator's

Manual, 9) Furthermore, Firbimatic knew and intended any wastewater collected

in an "independent vessel" to be disposed of into the sewer.

(1)    *Design, Testing, and Manufacture*

The creation and disposal of wastewater was a necessary and inherent step in the

function of the Firbimatic 132.  Firbimatic learned during its testing, design and

manufacture process and knew, at all times relevant to this complaint, that

wastewater (used interchangeably with the phrase "separator water") produced by

its equipment contained PCE.  The manual references solvent (PCE) several

times, evidencing Firbimatic's intent that the machine use and dispose of PCE.

(2)    *PCE Contaminated Wastewater Disposal*

 Firbimatic purposefully directed contaminated separator water into the sewer via

its manual.  Even in the case of scarce water supply, if a dry cleaner were to direct

the water separator into a small independent vessel, Firbimatic knew there were

no practical alternate means for disposal other than the drain/sewer available to

drycleaners until, at earliest, the mid-late 1980s.  Thus, with no other options,

even Firbimatic's alternative disposal method mandated sewer disposal.  It is

evident from Firbimatic's directive to connect the water separator to the sewer

that its purpose in directing the separator water to a small independent vessel in

the case of scarce water supply was not to avoid disposal down the drain and
resulting environmental contamination.

Rather, Firbimatic's instruction to capture separator water in a small
independent vessel in the case of scarce water supply was driven by economy, not
concern for the environment. Firbimatic so instructed so that the dry cleaner
could inspect the wastewater emanating from the 132 for defective performance.
If the wastewater appeared cloudy, PCE could be recaptured from the container
and put back into the dry cleaning machine. By directing wastewater into the
container, Firbimatic intended dry cleaners to pour off the water on top of the
container and maintain the excess PCE that would settle to the bottom. Firbimatic
makes clear in its manual that it planned for and intended wastewater disposal to
the sewer, from which it was released into the environment.

(3)     *Design and Manufacture Defects Cause PCE Disposal*

Despite planning for PCE disposal down the sewer by virtue of the 132's design
and instruction guide, Firbimatic failed to alter this defective design.
Furthermore, Firbimatic knew that its equipment's design and function resulted in
leaks and spills of PCE. During the manufacturing process, Firbimatic became
aware or should have become aware of these and other defects, resulting in
releases of PCE. Despite these known flaws, Firbimatic failed to create a safe
design for the Firbimatic 132 and failed to adequately warn Plaintiff of its
equipment's known defects.

(4)     *Failure to Warn of PCE Hazard and Proper Disposal*

The Firbimatic 132's operator's manual contains 7 pages of troubleshooting,
coined "explanatory tables for eventual troubles."(Operator's Manual, 1911:1-
1911:7). Many of these eventual troubles pertain to and require handling of PCE.
However, Firbimatic never warns the operator about the hazardous nature of PCE,
or how to property handle or dispose of it. The manual similarly neglects to
properly warn or advise regarding proper handling and disposal of the 132's

1    cartridge filters, which collected dirty PCE during the machine's normal function.

2    (Operator's Manual, 1414)

3        (5)    *Resulting Property Damage*

4    Firbimatic's acts outlined above caused physical injury to both the Property and

5    surrounding properties.  After PCE was deposited down the drain, it flowed into

6    the sewer, where it escaped into soil and groundwater at and surrounding the

7    Property.  As a result, soil at the Property is contaminated and its use is impaired.

8    Digging in it poses a threat to the health of the public, the private owner, and

9    anyone else occupying the Property.  Soil contamination has created toxic soil

10   vapors that pose a danger to public health and can easily escape into the air when

11   soil is moved or displaced.

12   Firbimatic's faulty equipment design further caused PCE spills and leaks at

13   Norman's.  During a spill or leak, PCE flowed out of Norman's Dry Cleaner and

14   came into contact with soil on the Property, where it was absorbed and

15   contributed to soil and groundwater contamination at and near the Property.

16   Additionally, the cleanup of these spills and leaks required disposal of PCE down

17   the drain, which proximately caused environmental contamination as described in

18   the preceding paragraph.

19   Wastewater produced by the Firbimatic machine also injured fixtures on the

20   Property by causing corrosion of the plumbing and pipes at and underlying the

21   Property.

22   The Firbimatic began to pollute the Property the first time it was operated on or

23   around 1984.  Use of the equipment caused leaks and spills resulting in PCE

24   contamination of soil and groundwater via direct contact.  These disposals

25   continued through the last operation of the Firbimatic at the Property on or around

26   2004.  Even after the machine was removed from the Property, the contaminated

27   wastewater it produced continued to pollute soil and groundwater at and near the

28   Property due to the slow release of PCE accumulated in the City's sewers.

1    23.  Plaintiff is informed and believes, and thereon alleges, that on or about 1991,

2   Multimatic was reorganized and continued to operate as Multimatic Corp.

3    24.  Plaintiff is informed and believes, and thereon alleges, that on or about October 31

4   2003, Multimatic Corp. sold substantial assets to Multimatic LLC in an asset purchase

5   agreement.  Multimatic LLC continued Multimatic Corp's business and is its successor in

6   interest.

7    25.  Plaintiff is informed and believes, and thereon alleges, that on or about October 31

8   2003, Multimatic Corp. changed its name to Kirrberg.

9    26.   Plaintiff is informed and believes and thereon alleges that Multimatic, Multimatic

10   Corp., Multimatic LLC, and Kirrberg are liable individually and as the parent corporations,

11   purchasing corporations, alter egos, agents, assignees, surviving entities and/or successor-in-

12   interest of each other.

13    27.   Plaintiff is informed and believes, and thereon alleges, that ERI is, and at all times

14   relevant to this complaint was, an environmental consulting company engaged in contaminant

15   investigation at the Property.  ERI drilled and installed five monitoring wells at the Property from

16   which it collected groundwater samples quarterly, over several years, including 2001, 2002, and

17   2003.  ERI drilled at least two of its wells into two separate water bearing zones: an upper zone

18   and lower zone separated by an aquitard, i.e., a low permeability layer. The aquitard functioned

19   as a natural barrier between the upper and lower underground zones. ERI pierced this natural

20   barrier in its drilling and installed monitoring well screens connecting the upper and lower water

21   bearing zones, causing groundwater from the upper zone to pour into the lower zone. The upper

22   groundwater ERI released into the lower zone contained chlorinated solvents (among them PCE).

23   ERI should have constructed monitoring wells that drew from each underground zone separately;

24   these wells are called nested monitoring wells. Nested monitoring wells are currently being used

25   at the Property to investigate contamination. ERI's wells have been abandoned because they

26   caused cross-contamination. ERI's cross-contaminating wells released contaminants from a

27   naturally contained shallow water bearing zone into the deeper more permeable soil and

28   groundwater underlying the Property, causing the release of the solvents, and spreading

1    contamination in surrounding groundwater.

2         28.   Plaintiff is informed and believes and thereon alleges that at all times relevant

3    herein ERI was acting as an agent, servant, and/or employee of Union Oil, Unocal, and Chevron

4    when it engaged in contaminant investigation at the Property.

5         29.   Plaintiff is informed and believes, and thereon alleges, that the City has, at all times

6    relevant to this complaint, owned, operated, maintained, supervised and/or controlled the City's

7    sewer system connecting to, and servicing the Property.  The operation of the sewer system by

8    the City led to the releases of hazardous substances, including PCE, from the City's sewer

9    system.  Closed circuit television investigation of the City's sewer main and laterals along E and

10   Grotto Streets, located near the Property, revealed breaks, cracks, defective joints and sags.

11   Through these defects in the City's sewer pipes, hazardous substances, including PCE, have

12   escaped and will continue to escape into the environment.  The acts or omissions by the City,

13   including its failure to maintain and operate its sewers in a safe manner to prevent the exfiltration

14   of hazardous substances, including PCE, from its sewer pipes, resulted in contamination in

15   groundwater near the Property. The City was, at all relevant times, in sufficient control of the

16   sewers to have known of the release of hazardous substances and to have prevented the resulting

17   contamination. The City knew or should have known that its operation of the City's sewer system

18   would have, and did, cause the contamination described herein.

19        30.   On March 6, 2008, Plaintiff submitted an amended claim for damages to the City

20   relating to the above described contamination pursuant to  Government Code § 900 et seq.  A

21   copy of said claim is attached hereto as Exhibit A. On April 24, 2008, the City informed Plaintiff

22   that the claim was rejected.  A copy is attached hereto as Exhibit B.

23        31.   As a direct and proximate result of Defendants' conduct and failure to act, their

24   actions resulted in the release of hazardous substances onto the properties, and surrounding

25   properties, soils, and groundwater.

26                              **FIRST CLAIM FOR RELIEF**

27        **(Cost Recovery Pursuant to CERCLA § 107(a) - Against All Defendants)**

28        32.   Plaintiff realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 31 as though fully set forth herein.

33.    The Property is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9). The contaminants located in the soil and ground water at, on, or under the Property, including but not limited to PCE, are "hazardous substances" within the meaning of 42 U.S.C. § 9601(14).

34.    The City's sewer system connecting to and servicing the Property is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).  The contaminants located in the soil and groundwater near the Property, including but not limited to PCE, are "hazardous substances" within the meaning of 42 U.S.C. § 9601(14).

35.    Each Defendant is a liable or potentially liable person within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a), as a person who owns or operates a facility where hazardous substances were disposed, who arranged for the disposal or treatment of hazardous substances; and/or who accepted hazardous substances for transport.

36.    Under Section 107 of CERCLA, 42 U.S.C. § 9607, Plaintiff seeks recovery of necessary costs of responses and payment from Defendants, and each of them, for Plaintiff's outlays of all past, present, and future necessary response costs incurred in response to the release of hazardous substances at or affecting the Property or surrounding properties.  The release and disposal of the hazardous substances is continuing in nature.

37.   Union Oil Defendants owned and operated the Property at the time hazardous substances were released and disposed.  Union Oil Defendants arranged for the disposal of hazardous substances at the Property and are responsible for the past and continued disposal and release of hazardous substances into the soil, groundwater and environment at and surrounding the Property.  Union Oil Defendants are liable for the contamination pursuant to 42 U.S.C. § 9607(a).

38.   Manufacturer Defendants are past and current arrangers of prior and ongoing disposal and release of hazardous substances into the soil, groundwater, and environment at the Property.  As described in paragraph 22, *supra*, Manufacturer Defendants took affirmative steps to dispose of PCE.  Their design, manufacture and instruction constituted intentional planning for

1   disposal.  Thus, under *Burlington Northern v. Santa Fe Ry. Co.*, 129 S. Ct. 1870 (2009),

2   Manufacturer Defendants are liable for the contamination pursuant to 42 U.S.C. § 9607(a)(3).

3        39. ERI is an environmental consulting company that was engaged in investigation of

4   contamination at the Property. ERI's drilling and construction of monitoring wells from 2000

5   through 2002 resulted in the release and spread of contamination in the Property's soil and

6   groundwater as explained in paragraph 27 above. As a result ERI is subject to CERCLA liability

7   as an "operator" of a facility.

8            a.        ERI qualifies as an "operator" under 42 U.S.C. § 9607(a)(2) because ERI

9   had the authority to control the release of the contamination (i.e. drilling and well construction

10  procedures) during the release and spread of hazardous substances into the environment. Union

11  Oil hired ERI to drill wells and collect samples on the Property, thereby vesting ERI with

12  authority to drill. ERI selected, implemented and controlled drilling procedures that caused

13  contaminants to migrate from contaminated shallow underground aquifers to uncontaminated

14  deeper aquifers, resulting in widespreading the pollution. This process occurred as contaminated

15  water traveled down pathways ERI constructed for its monitoring wells. Contaminants spread

16  include chlorinated solvents (among them PCE) originating in part from operations during Union

17  Oil's ownership.

18       40.   The City is the past and current owner and operator of the sewer system connecting

19  to the Property. The City is also the past and current arranger and transporter of past and

20  continued disposal and release of hazardous substances into the soil, groundwater and

21  environment surrounding the Property as described in paragraph 29 of this complaint.  The City

22  is liable for contamination pursuant to 42 U.S.C. § 9607(a).

23       41.   Plaintiff has incurred, and will continue to incur, necessary response costs,

24  including costs of investigation, removal and/or remedial actions in the investigation, clean up

25  and abatement of the releases and threatened releases of hazardous substances from Defendants'

26  ownership, operations and activities at and/or near the Property.   All of the necessary response

27  costs incurred and to be incurred by Plaintiff are a result of the contamination of the Property and

28  surrounding properties, caused by Defendants.

42.   All costs incurred, and to be incurred, by Plaintiff are necessary costs of response consistent with the provisions of CERCLA and the National Contingency Plan.

43.   Plaintiff continues to incur response costs and other costs in connection with the investigation and remediation of the Property.  There has been no completion of a removal action.

44.   Defendants, and each of them, are jointly and severally liable to Plaintiff pursuant to 42 U.S.C. § 9607 for all of the past, present and future necessary costs of response including without limitations, investigation and remediation expenses, attorneys' fees, oversight costs and interest, in an amount to be determined at trial.

45.   Pursuant to 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment that Defendants, and each of them, are liable in any subsequent action by Plaintiff to recover further responses costs or damages incurred as a result of hazardous substances at and around the Property.

## SECOND CLAIM FOR RELIEF

### (RCRA, 42 U.S.C. § 6972(a)(1)(B)- Against the City Only)

46.   Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 45 as though fully set forth herein.

47.   Pursuant to 42 U.S.C. § 6972(b)(2)(A), on February 25, 2008, Plaintiff duly notified the City, the Administrator of the United States Environmental Protection Agency ("USEPA"), the Regional Administrator of the USEPA, the Executive Director of State Water Resources Control Board; the Executive Director of the California Integrated Waste Management Board; and the Director of California Department of Toxic Substances Control, of the contamination at and surrounding the Property and of Plaintiff's intent to bring this suit against the City.  On May 27, 2010 Plaintiff amended its original statutory notification to the City and provided a notice of amendment to the City and to the agencies identified in this paragraph.  True and correct copies of the February and May notices are attached hereto as Exhibits "C" and "D" respectively, and incorporated herein by this reference.

48.   Plaintiff instituted this action more than ninety (90) days after mailing of notice on

the City and others.

49.   Plaintiff duly served a copy of this Complaint on the United States Attorney General and the Administrator of the USEPA by registered mail.

50.   This action against the City is brought pursuant to the Citizen Suit provisions of RCRA, 42 U.S.C. § 6972(a)(1)(B) et seq. and the applicable regulations thereunder.

51.   The hazardous substances, including PCE, handled, transported and disposed of by the City at, around and adjacent to the Property are "hazardous wastes" within the meaning of RCRA, 42 U.S.C. § 9603(5).

52.   RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), provides that any person may commence a civil action on its own behalf for appropriate relief against any person who is a "past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

53.   Plaintiff is informed and believes, and on that basis alleges, that the primary cause of the releases of hazardous wastes at the Property was a result of the City's disposal, handling, transportation, release and/or abandonment of hazardous waste.

54.   The City discharged and permitted the discharge and release of hazardous substances, including PCE, to the soil and groundwater by its operation and control of the disposal and sewer systems at the Property.   Testing underneath and surrounding the City's sewer at the intersection of E and Grotto streets revealed that the PCE originates from the City's sewer more than 100 feet from the building (Norman's dry cleaner) on the Property. Additionally, testing revealed that hazardous substances other than PCE, such as Trichloromethane ("TCM"), have been found in the groundwater along the City's sewer line near the intersection of E and Grotto streets.   The discharge and release of hazardous substance is a direct and proximate result of exfiltration from the City's sewer pipes.

55.   As owners and operators of the sewer system connecting to the Property, the City is the past and present generator, past and present transporter, and past and present operator of a

1    treatment, storage and/or disposal facility.  Closed circuit television investigation of the City's

2    sewer main and laterals along E and Grotto Streets, adjacent to and servicing the Property,

3    revealed breaks, cracks, defective joints and sags.  These defects observed in the City's sewer

4    system, which the City has exclusive control over,  near the Property have caused and will

5    continue to be the primary cause of hazardous substances in the environment on, beneath, at

6    and/or surrounding the Property.

7              56.   The City has knowingly contributed and is contributing to the past and present

8    handling, storage, treatment transportation and disposal of solid and hazardous waste which

9    presents an imminent and substantial endangerment to human health and the environment.

10   Testing underneath and surrounding the intersection of E and Grotto streets has revealed PCE in

11   the soil and groundwater near the sewer main and laterals in an amount that is above the federal

12   safe drinking water level and the California Public Health Goal for PCE.  Specifically, testing has

13   shown:

14            (a)     Soil PCE levels of 5,040 micrograms per kilogram (ug/kg) along the City's sewer

15                    main; and

16            (b)     Groundwater PCE levels of 14,300 micrograms per liter (ug/l) downgradient from

17                    the City's sewer.

18   The PCE originates from the City's sewer at more than 100 feet from the building (Norman's

19   Dry Cleaner) on the Property.  The plume of contamination emanating from the City's sewer is

20   spreading.  Testing has revealed that PCE leaked from the City's sewer has migrated to the

21   deeper water bearing zone.  The endangerment caused by the City has been ongoing since at least

22   the early 1980s and is continuing in nature.

23            57.   The discharge and threatened discharge of hazardous substances has unreasonably

24   affected water quality in that the discharge or threatened discharge is deleterious to the beneficial

25   uses of state waters, and has impaired water quality to a degree which creates a threat to public

26   health.  The conditions threaten to continue unless the discharge or threatened discharge is

27   permanently cleaned up and abated.

28            58.   Plaintiff is informed and believes, and on that basis alleges, that the hazardous waste

1    contamination resulting from the City's disposal, handling, transportation, release and/or

2    abandonment of hazardous waste, as detailed above, presents an imminent and substantial

3    endangerment to health and/or the environment as hazardous wastes have infiltrated to the soil

4    and groundwater in and around the Property.  The impact of the pollution on the environment has

5    already occurred and is substantial because significant quantities of toxic substances have been

6    released into the soil and groundwater and have impaired the beneficial use of the groundwater

7    beneath the Property. Further, testing reveals that PCE has migrated and continues to migrate

8    beneath the downgradient residential community, toward water supply wells, surface water and

9    nearby schools, and now reaches more than 1,400 feet from the intersection of E and Grotto

10   streets.

11          59.   No action or activities have been commenced or are being diligently prosecuted by

12   the Administrator or the State under the relevant provisions of RCRA or CERCLA as described

13   in 42 U.S.C. § 6972(b)(2)(B-C).

14          60.   Plaintiff seeks injunctive relief under RCRA ordering the City to take such action as

15   may be necessary to address and abate the contamination at the Property, including without

16   limitation: to comply with any and all requirements of cleanup and abatement orders; expend

17   funds to further investigate, test, assess, study, monitor, and remediate the contamination at the

18   Property through the issuance of a "no further action" letter or other similar letter or documents

19   indicating that the Site has been remediated.

20          61.   Pursuant to 42 U.S.C. 6972(e), Plaintiff seeks an award of the costs of this litigation,

21   including reasonable attorneys' fees and consultants fees, including such fees to monitor the

22   City's compliance with any orders or judgment issued by this Court.

23                              **THIRD CLAIM FOR RELIEF**

24          **(Hazardous Substance Statutory Indemnity - Against All Defendants)**

25          62.   Plaintiff realleges and incorporates by reference the allegations contained in

26   Paragraphs 1 through 61 as though fully set forth herein.

27          63.   The Carpenter-Presley-Tanner Hazardous Substance Account Act, California

28   Health & Safety Code Sections 25300, et seq. (hereinafter the "HSAA") was enacted to

encourage expedient clean-up of contaminated properties.  To provide such encouragement, the legislature included the statutory right of indemnification for those parties who incur response costs and those parties who are responsible for the contamination.

64.    Plaintiff has and will continue to incur costs arising from the hazardous substance contamination of the soil and groundwater in and around the Property.

65.    Defendants, and each of them, are liable persons under the HSAA due to their status as either owners or operators of the property, transporters of hazardous waste, or arrangers of the disposal and discharge of hazardous substances on account of said Defendants' actual and direct control of the method of disposal of PCE on the Property, and such liability has not previously been discharged pursuant to any state apportionment proceeding. Plaintiff is entitled to indemnification and contribution from Defendants, in whole or in part, based upon California Health & Safety Code Section 26363(e).

## FOURTH CLAIM FOR RELIEF

### (Equitable Indemnity- Against All Defendants Except the City)

66.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 65 as though fully set forth herein.

67.    In the event liability should be established in this action or in any administrative or regulatory action based on the contamination alleged in this action, whose liability is expressly denied, Plaintiff alleges on information and belief that such liability will arise wholly or partly by reason of the conduct of Defendants, and/or that Defendants are jointly liable for said liability. Defendants, and each of them, are therefore, bound and obligated to defend, indemnify and hold harmless Plaintiff from and against any and all claims, losses, damages, attorneys' fees, judgments and settlement expenses incurred, or to be incurred, in this action by Plaintiff.

68.    Plaintiff intends this complaint to be notification to Defendants that Plaintiff hereby tenders to them the obligation to defend Plaintiff.

69.    Plaintiff has necessarily retained legal counsel at Plaintiff's sole cost and expense and to prepare, file and prosecute the claims as set forth herein.  Plaintiff has incurred, and will continue to incur, liability for attorneys' fees and costs and, in the prosecution of these claims, a

1   sum which is presently not ascertained but will be proven at trial.

2       70.   Plaintiff is entitled to indemnity from Defendants for all such monies expended and

3   to be expended by Plaintiff to remedy the contamination on, underneath and surrounding the

4   Property, and for all other damages incurred by Plaintiff.

5                              **FIFTH CLAIM FOR RELIEF**

6           **(Common Law Contribution- Against All Defendants Except the City)**

7       71.   Plaintiff realleges and incorporates by reference the allegations contained in

8   Paragraphs 1 through 70 as though fully set forth herein.

9       72.   In the event liability should be established on the part of Plaintiff, which liability is

10  expressly denied, Plaintiff is informed and believes, and thereon alleges, that it may be obligated

11  to pay sums representing a percentage of liability not Plaintiff's own, but rather that of

12  Defendants.  Therefore, Plaintiff requests an adjudication and determination with respect to

13  degrees of liability, if any, on its part and on the part of Defendants so as to determine that

14  portion of the amount, if any, by which Plaintiff is found liable, which actually represents a

15  portion of liability of all of the Defendants.

16                             **SIXTH CLAIM FOR RELIEF**

17                 **(Declaratory Relief - Against All Defendants)**

18      73.   Plaintiff realleges and incorporates by reference the allegations contained in

19  Paragraphs 1 through 72 as though fully set forth herein.

20      74.   A determination of the proportionate degree of liability, if any, of Plaintiff, on the

21  one hand, and Defendants, on the other, is necessary to protect the rights of Plaintiff.

22      75.   An actual controversy exists relating to the legal rights and duties of Plaintiff and

23  Defendants, and each of them, for which Plaintiff desires a declaration of its rights and

24  indemnification, in which Plaintiff contends, and Plaintiff is informed and believes, that

25  Defendants deny, the following:

26      a.      That as between these parties, the responsibility, if any, for the damages claimed

27              by Plaintiff rests entirely on Defendants;

28      b.      That as a result, Defendants are obligated to partially indemnify or fully indemnify

1    Plaintiff for sums that Plaintiff may be held to pay as a result of any damages,

2    judgments, settlement or other awards recovered against Plaintiff by the federal or

3    state government or private party as a result of the toxic chemical contamination

4    of the Property, properties near and adjacent properties including, but not limited

5    to, surface and subsurface soil and water; and

6        c.      Plaintiff is informed and believes that Defendants deny any such liability.

7        76. Plaintiff requests a judicial determination of Plaintiff's rights, indemnification and

8    contribution, any declaration that Defendants and/or others, and not Plaintiff, are liable for all of

9    the costs incurred, and to be incurred to remove, clean-up and remediate the alleged hazardous

10   substance contamination of the soil and groundwater in and around the Property.

11   **SEVENTH CLAIM FOR RELIEF**

12   **(Continuing Private Nuisance - Against All Defendants)**

13       77. Plaintiff realleges and incorporates by reference the allegations contained in

14   Paragraphs 1 through 76, as though fully set forth herein.

15       78. Defendants, and each of them, caused or permitted the contamination alleged in this

16   action by their negligence, intentional or otherwise, actionable acts and/or omissions, as

17   described herein.

18       79. The contamination constitutes a nuisance within the meaning of Section 3479 of

19   California Civil Code. Defendants, and each of them, have interfered with Plaintiff's right to

20   quiet enjoyment of the Property.

21       80. Plaintiff is informed and believes, and on that basis alleges, that the contamination is

22   continuing and abatable.

23       81. As a direct and proximate result of the nuisance, Plaintiff has been and will be

24   damaged by incurring costs to respond to the alleged hazardous substance contamination in and

25   around the Property in an amount to be established at trial.  Plaintiff has been and will be

26   damaged by loss of use, constructive eviction of and from the Property, and any loss in value of

27   the Property.

28       82.  This claim is confined to a period no earlier than three years prior to the date each

defendant subject to this claim was named a party to the action.

## EIGHTH CLAIM FOR RELIEF

### (Continuing Public Nuisance - Against All Defendants)

83. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 82 as though fully set forth herein.

84. The contamination on and about the Property constitutes a public nuisance within the meaning of California Water Code Section 13050(m), and California Civil Code Sections 3479 and 3480.

85. Plaintiff is informed and believes, and on that basis alleges, that the contamination is continuing and abatable.

86.    As a direct and proximate result of Defendants' actions and activities, Plaintiff has been, and will be, damaged by incurring costs to respond to the alleged hazardous substance contamination in and around the Property in an amount to be established at trial.

87.    Plaintiff has suffered, and will continue to suffer, harm that is different from the type of harm suffered by the general public as a result of the public nuisance, as alleged herein, because Plaintiff's property has been damaged, Plaintiff has been required to respond to the contamination and the contamination has interfered with Plaintiff's right to quiet enjoyment of the Property.

88. This claim is confined to a period no earlier than three years prior to the date each defendant subject to this claim was named a party to the action.

## NINTH CLAIM FOR RELIEF

### (Continuing Public Nuisance Per Se - Against All Defendants)

89.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 88 as though fully set forth herein.

90.    Plaintiff alleges that the conduct of Defendants, and each of them, which has resulted in contamination of soil and groundwater on and about the Property, and surrounding properties, and constitutes a public nuisance, is a violation of California Water Code Sections 13050(m), 13304, 13350, and 13387, and California Health & Safety Code sections 5411,

1  5411.5, and 117555, the purposes of which are to set a standard of care or conduct to protect

2  Plaintiff, and all persons and property of the general public at large, as well as the environment,

3  from the type of conduct engaged in by Defendants, and each of them. Therefore, such improper

4  activities and violations constitute a public nuisance *per se*.

5        91.    Defendants, and each of them, have failed to comply with the state law as detailed

6  above.  Plaintiff has sustained special injury as a result of this public nuisance, as the

7  contamination has interfered with Plaintiff's right to quiet enjoyment of the Property, as

8  described herein.  As a further direct and proximate cause of the public nuisance *per se* created

9  by Defendants, and each of them, Plaintiff has suffered damages as previously described herein,

10  including other consequential, incidental, and general damages to be proven at trial. Plaintiff

11  seeks abatement of the public nuisance, and all other legally available costs and damages.

12        92.  This claim is confined to a period no earlier than three years prior to the date each

13  defendant subject to this claim was named a party to the action.

14  **TENTH CLAIM FOR RELIEF**

15  **(Continuing Trespass - Against All Defendants Except the City)**

16        93.  Plaintiff realleges and incorporates by reference the allegations contained in

17  Paragraphs 1 through 92 as though fully set forth herein.

18        94.  Defendants have trespassed and continue to trespass on the Property by

19  contaminating the soil and groundwater on and about the Property. Defendants' acts and

20  omissions have interfered with Plaintiff's quiet use and enjoyment of its property.

21        95.  Said contamination occurred as a result of the negligent and/or intentional conduct

22  of the Defendants, and each of them, and/or as a result of conduct which constitutes an

23  ultra-hazardous activity.

24        96.  As a direct and proximate result of said trespass, Plaintiff has been damaged in an

25  amount to be proven at trial.

26        97.  This claim is confined to a period no earlier than three years prior to the date each

27  defendant subject to this claim was named a party to the action.

28  **ELEVENTH CLAIM FOR RELIEF**

28

**(Dangerous Condition of Public Property- Against the City Only)**

98.   Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 97 as though fully set forth herein.

99.     Plaintiff is informed and believes, and thereon alleges that at all relevant times, the City owned, operated, maintained, supervised, and/or controlled the City's sewer system connected **to** the Property.

100.     Plaintiff is informed and believes, and thereon alleges that at all relevant times, the City's sewer system was in a dangerous condition in that hazardous wastes and/or substances were released from the City's sewer system and, sewage overflows, backups and/or leaks occurred in the vicinity of the Property. The overflows, backups and/or leaks of hazardous wastes and/or substance released from the City's sewer system legally and proximately caused the contamination in, at or around the soil and groundwater near the Property.  The contamination described herein was a reasonably foreseeable risk of the dangerous condition of the City's sewer system.

101.     Plaintiff is informed and believes, and thereon alleges that the City knew or should have known or been able to discover the dangerous condition of the City's sewer system for a sufficient period of time to have protected against it, because, for example, the City allowed and was aware of the disposal of hazardous wastes or substances, such as those described herein, into the City's sewer system.  Despite this knowledge, the City failed to respond by either maintaining the City's sewer system, fixing it, removing the hazardous wastes or substances, or otherwise properly respond to the hazardous wastes or substances.

102.     As a direct and proximate result of the dangerous condition of the City's sewer system, Plaintiff was, and continues to be injured in that the hazardous wastes or substances contaminated the soil and groundwater near the Property, and the environment in general causing Plaintiff's damages including, but not limited to, response costs incurred and to be incurred in the future to properly respond to the alleged contamination near the Property, and related costs in making the property safe from contamination.  Such costs also include attorneys' fees and consultants' fees incurred as a direct and proximate result of said dangerous condition.

**TWELFTH CLAIM**

**(Strict Liability - Against Manufacturer Defendants Only)**

103.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 98 as though fully set forth herein.

104.    Plaintiff is informed and believes and thereon alleges that Manufacturer Defendants designed, manufactured, formulated, packaged, distributed, sold and/or installed dry cleaning equipment specifically designed to store, use, process, and dispose of PCE.

105.    Plaintiff is informed and believes and thereon alleges that the Manufacturer Defendants represented, asserted, claimed and warranted that chlorinated solvents and/or chlorinated solvent equipment could be used in conformity with accompanying instructions and labels in a manner which would not cause injury or damage.

106.    Plaintiff is informed and believes and thereon alleges that the Manufacturer Defendants knew, or should have known, that the dry cleaning equipment would be used without inspection for defects, and if any inspection performed, that the defects would not be discovered with the exercise of reasonable diligence.

107.    Plaintiff is informed and believes and thereon alleges that the Manufacturer Defendants designed, manufactured, formulated, packaged, distributed, sold, applied, disposed of, and/or installed products containing PCE.  The Manufacturer Defendants knew, or should have known, that PCE would contaminate soils and groundwater.

108.    Plaintiff is informed and believes, and thereon alleges, that at all relevant times the Manufacturer Defendants:

a.    Were aware of the use of PCE in the dry cleaning process or as cleaning solvents;

b.    Were aware of the typical waste and disposal practices resulting from the intended use of their dry cleaning equipment.  Despite such knowledge, these defendants designed their equipment in such a manner that would result in spills, leaks, and/or discharge of PCE during normal operations;

c.    Improperly designed their dry cleaning equipment by failing to provide

appropriate mechanisms to prevent and/or treat releases or spills of PCE and its by-products for such equipment;

        d.      Failed to design proper mechanisms which would eliminate prevent and/or treat contamination arising from the dry cleaning process performed by the equipment, such as contamination from separator waste water, spent filter materials,  and similar hazardous waste by products;

        e.      Knew or should have known of appropriate equipment redesigns, retrofits, and/or modifications to protect against environmental contamination associated with use of such equipment, and negligently and/or consciously disregarded this knowledge and failed to redesign, modify, and/or retrofit the subject equipment.  Safer alternative designs and cleaning processes were scientifically feasible and economical.  Safer alternative methods of disposal and/or treatment of waste water were also scientifically feasible and economical;

        f.      Failed to warn Plaintiff and all other users of their products that the recommended methods of use and disposal of their products would in fact cause contamination of the Property.

109.    Plaintiff is informed and believes and thereon alleges that the above described defects in the dry cleaning equipment existed when the dry cleaning equipment left the Manufacturer Defendants' possession.  The dry cleaning machines were used in a manner in which they were foreseeably intended to be used.

110.    As a proximate result of the defects alleged herein, the Manufacturer Defendants caused damage to Plaintiff's Property by contaminating with hazardous substances the soil and groundwater on and around the Property. As a result, Plaintiff has incurred additional damages including, but not limited to, response costs incurred and to be incurred in the future to properly respond to the alleged PCE contamination in and around the Property, and related costs in making the property safe from contamination.  Such costs also include attorneys' fees and consultants' fees incurred as a direct and proximate result of said defects.

### THIRTEENTH CLAIM

### (Negligence - Against Manufacturer Defendants Only)

31

1      111.    Plaintiff realleges and incorporates by reference the allegations contained in

2   Paragraphs 1 through 106 as though fully set forth herein.

3      112.    Plaintiff is informed and believes and thereon alleges that Manufacturer

4   Defendants negligently designed, manufactured, formulated, packaged, distributed, sold and/or

5   installed dry cleaning equipment specifically designed to store, use, process, and dispose of PCE.

6      113.    Plaintiff is informed and believes and thereon alleges that the Manufacturer

7   Defendants negligently represented, asserted, claimed and warranted that chlorinated solvents

8   and/or chlorinated solvent equipment could be used in conformity with accompanying

9   instructions and labels in a manner which would not cause injury or damage.

10     114.    Plaintiff is informed and believes and thereon alleges that the Manufacturer

11  Defendants knew, or should have known, that the dry cleaning equipment would be used without

12  inspection for defects, and if any inspection performed, that the defects would not be discovered

13  with the exercise of reasonable diligence.

14     115.    Plaintiff is informed and believes and thereon alleges that the Manufacturer

15  Defendants negligently designed, manufactured, formulated, packaged, distributed, sold, applied,

16  disposed of, and/or installed products containing PCE.  The Manufacturer Defendants knew, or

17  should have known, that PCE would contaminate soils and groundwater.

18     116.    Cross-Complainant is informed and believes, and thereon alleges, that at all

19  relevant times the Manufacturer Defendants:

20          a.      Were aware of the use of PCE in the dry cleaning process or as cleaning

21  solvents;

22          b.      Were aware of the typical waste and disposal practices resulting from the

23  intended use of their dry cleaning equipment.  Despite such knowledge, these defendants

24  designed their equipment in such a manner that would result in spills, leaks, and/or discharge of

25  PCE during normal operations;

26          c.      Improperly designed their dry cleaning equipment by failing to provide

27  appropriate mechanisms to prevent and/or treat releases or spills of PCE and its by-products for

28  such equipment;

1    d.    Failed to design proper mechanisms which would eliminate prevent and/or

2    treat contamination arising from the dry cleaning process performed by the equipment, such as

3    contamination from separator waste water, spent filter materials,  and similar hazardous waste by

4    products;

5    e.    Knew or should have known of appropriate equipment redesigns, retrofits,

6    and/or modifications to protect against environmental contamination associated with use of such

7    equipment, and negligently and/or consciously disregarded this knowledge and failed to redesign,

8    modify, and/or retrofit the subject equipment.  Safer alternative designs and cleaning processes

9    were scientifically feasible and economical.  Safer alternative methods of disposal and/or

10   treatment of waste water were also scientifically feasible and economical;

11   f.    Failed to warn Plaintiff and all users of their products that the

12   recommended methods of use and disposal of their products would in fact cause contamination

13   of the Property.

14   117.   Plaintiff is informed and believes and thereon alleges that the above described

15   defects in the dry cleaning equipment existed when the dry cleaning equipment left the

16   Manufacturer Defendants' possession.  The dry cleaning machines were used in a manner in

17   which they were foreseeably intended to be used.

18   118.   As a proximate result of the defects alleged herein, the Manufacturer Defendants

19   negligently caused damage to Plaintiff's Property by contaminating with hazardous substances

20   the soil and groundwater on and around the Property. As a result, Plaintiff has incurred additional

21   damages including, but not limited to, response costs incurred and to be incurred in the future to

22   properly respond to the alleged PCE contamination in and around the Property, and related costs

23   in making the property safe from contamination. Such costs also include attorneys' fees and

24   consultants' fees incurred as a direct and proximate result of said negligence.

25   **PRAYER FOR RELIEF**

26   **WHEREFORE**, Plaintiff prays to this Court for the following relief:

27   1.    For recovery and contribution from Defendants, and each of them, of all response

28   costs incurred, and to be incurred by Plaintiff, in response to the alleged release of

1    hazardous substances in and around the Property according to proof at trial;

2    2.    For damages against Defendants, jointly and severally, in an amount equal to all

3          response costs and all other costs incurred in investigating, removing, cleaning up

4          and remediating the alleged hazardous substance contamination in an amount

5          according to proof at trial;

6    3.    For compensatory damages according to proof including;

7    4.    For incidental and consequential damages according to proof;

8    5.    For a permanent injunction requiring the City to investigate and remediate

9          contamination on and around the Property;

10   6.    For prejudgment interest at the legal rate;

11   7.    For costs;

12   8.    For consultants' fees and costs;

13   9.    For a declaration that Defendants, and each of them, are jointly and severally

14         liable for abating the nuisance on the Property;

15   10.   For recoverable costs;

16   11.   For attorney fees; and

17   12.   For such other and further relief as this Court deems just and proper.

18                          **<u>DEMAND FOR JURY TRIAL</u>**

19        Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

20   on all issues so triable.

21

22   Dated: December 10, 2010                    GREBEN & ASSOCIATES

23

24                                               /s/ Jan A. Greben
                                                 _____
25                                               Jan A. Greben
                                                 Jeff Coyner
26                                               Danielle De Smeth
                                                 Attorneys for Plaintiff and Cross-Defendant KFD
27                                               Enterprises, Inc., a California corporation dba
                                                 Norman's Dry Cleaner, and Third-Party Defendant
28                                               Kenneth Daer